UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                        Criminal Case No. 24-20026

WILLIE B. HOPKINS,              Sean F. Cox
                                              United States District Court Judge
    Defendant.
_____/

**OPINION & ORDER
DENYING DEFENDANT'S MOTIONS TO SUPPRESS (ECF NOS. 41 & 42)**

In this criminal case, Defendant Willie B. Hopkins ("Hopkins") is charged in a multiple count indictment, alleging that he committed several armed robberies of various businesses, in violation of the Hobbs Act. On August 9, 2023, Hopkins was arrested during a traffic stop and taken to the police station, where he made certain statements after being read his *Miranda* rights. The police then obtained several search warrants, for Hopkins's vehicle, home, cell phone, and email account.

The matter is now before the Court on two motions to suppress evidence filed by Hopkins. In the first one, Hopkins asks the Court to suppress statements he made while being interviewed at the police station, arguing that he did not knowingly or voluntary waive his *Miranda* rights. In the second one, he challenges the initial traffic stop, and the search warrants, arguing that the search warrant affidavits lack probable cause. This Court held an evidentiary hearing, and heard oral argument, on January 8, 2025. For the reasons set forth below, the Court DENIES both motions.

**BACKGROUND**

1

Hopkins is charged in a six-count Indictment with: 1) three counts of Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a); and 2) three counts of Using a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  The charges stem from a vehicle traffic stop that occurred on August 8, 2023, in Pittsfield Township, Michigan.

In July and August of 2023, a series of armed robberies occurred in Washtenaw County, Michigan and Sylvania, Ohio.  The Pittsfield Township Police Department, and others, were investigating those robberies.

There was a Bulletin out that gave a description of the suspect and the vehicle being driven at the robberies.

On August 9, 2023, Pittsfield police officers conducted a traffic stop of a vehicle being driven by Hopkins.  Hopkins, who has a suspended driver's licence and had no insurance on the vehicle, was arrested and taken to the Pittsfield police station.  While at the station, Hopkins was interviewed by law enforcement officers.  After Hopkins's arrest and interview, officers requested and obtained search warrants for Hopkins's vehicle, his residence, his cell phone and cellular service provider, and his email account.

On October 31, 2024, Hopkins filed two motions to suppress in this case.  (ECF Nos. 41 & 42).

In the first motion, Hopkins asks the Court to suppress statements he made while being interviewed at the police station, arguing that he did not knowingly or voluntary waive his *Miranda* rights.  Defendant contends that the statements he made to police officers on August 9, 2023, should be suppressed because he did not knowingly and voluntarily waive his right not to

speak or to have an attorney present. Hopkins asserts that his statements to the officers after being read his *Miranda* rights were not knowing or voluntary because: 1) he did not comprehend the rights that were read to him because he "had not slept for over 24 hours, and he could not concentrate or understand what Handy was saying;" 2) he did not understand his rights because he has a learning disability; 3) "there was no form provided to him nor was there a determination that he understood what was being said." Hopkins contends that these circumstances render this statements to law enforcement involuntary, asserting:

> In this case, Hopkins was not provided a form, and he was not asked whether he understood his rights. From the Detective's training and experience she knew or should have known that it cannot be presumed that an arrestee understands what is being read to him. Moreover, it was late at night, Hopkins was tired, he was arrested for a minor matter, and he was being interrogated by a detective. His fear, stress, and anxiety, along with his learning disabilities and inability to read or comprehend the *Miranda* rights read to him prevented him from understanding the nature of the rights he abandoned and the consequences of the decision to abandon them. Hopkins did not voluntarily abandon his rights to remain silent, ask for an attorney, or stop the interview.

(Def.'s Br. at 5).

In response, the Government contends that the motion should be denied as the evidence belies Hopkins's assertions. It asserts:

> Despite numerous arrests and convictions going as far back as 1980, receiving *Miranda* warnings three times throughout the investigation on the night of his arrest, invoking his right to terminate a later interview, and Hopkins' statements to the contrary during his interview, he now claims that he did not actually understand his right to remain silent and was too tired to knowingly waive that right when the detective interviewed him. Because Hopkins' claims are directly contradicted by video and documentary evidence of him acknowledging, reciting, and exercising his *Miranda* rights, the motion to suppress his statements must be denied.

(Govt.'s Br. at 2).

In his second motion, Hopkins challenges the initial traffic stop and also challenges the

search warrants, arguing that the search warrant affidavits lack probable cause. Hopkins's motion begins by asserting that the police unlawfully stopped Hopkins in his vehicle. He asserts that the police stopped him "because he fit a profile rather than because a traffic violation occurred." (Def.'s Br. at 12). Hopkins also challenges the search warrants, arguing that the search warrant affidavits lack probable cause. Hopkins further asserts that the *Leon* good-faith exception does not apply.

In response, the Government contends that the search warrant affidavits established a nexus between Hopkins, the robberies, and the items/areas to be searched. It also argues that, even if this Court should conclude that any of the affidavits failed to establish probable cause, the *Leon* good-faith exception to suppression of the evidence would apply under the circumstances presented here.

With the issues so framed by the parties, this Court held an evidentiary hearing on the motions on January 8, 2025. At that hearing, the Government called two witnesses: 1) Pittsfield Township Police Department ("PTPD") Corporal Tyler Maxey; and 2) PTPD Detective Tiffany Handy. The Government also introduced the following exhibits into evidence: 1) the PTPD's Armed Robbery Bulletin (Ex. 1); 2) a video of the traffic stop (Ex. 2); 3) another video from the patrol car (Ex. 3); 4) a video from the interview room at the PTPD station; 5) a PTPD *Miranda* form (Ex. 5); 6) another video from the PTPD station (Ex. 6); 7) the Vehicle Search Warrant (Ex. 7); 8) the PTPD Impound & Inventory Search Policy (Ex. 8); 9) the Cellphone Search Warrant (Ex 9); 10) the Cellular Provider Search Warrant (Ex. 10); 11) the Residence Search Warrant (Ex. 11); and the Google Search Warrant (Ex. 12).

Defendant cross-examined the Government's two witnesses but did call any witnesses of

his own or introduce any exhibits at the evidentiary hearing.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard and observed the witnesses who testified at the evidentiary hearing, allowing for this Court to assess credibility, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In July and August of 2023, a series of armed robberies occurred in Washtenaw County, Michigan and Sylvania, Ohio. The Pittsfield Township Police Department, and others, were investigating those robberies.

In August of 2023, Corporal Tyler Maxey and Detective Tiffany Handy were both employed by the Pittsfield Township Police Department ("PTPD").

On August 8, 2023, a gas station located at 4005 W. Washtenaw Avenue in Pittsfield Township was robbed at gun point. There was a Bulletin distributed within the PTPD that gave a description of the suspect and the vehicle being driven at that robbery. (Govt.'s Ex. 1). That Bulletin included three images. One is a photo of the suspect's vehicle and the other two are images of the suspect. The narrative portion of the Bulletin stated:

> On 8/8/23 at approximately 0035 hours, the above suspect produced a handgun and demanded cash from the Mobile Gas at 4005 Washtenaw Ave. He is described as a black male, approximately 40-50 years, approximately 6', wearing a blue knit hat, blue medical mask, black t-shirt, black pants and black Jordan Jumpman Pro basketball shoes. The vehicle is described as a second-generation Chrysler 300, black in color, with tinted windows.

(*Id.*).

Maxey was employed as a Road Patrol Corporal and was training another officer (Officer

Hohman), on August 9, 2023. The two officers were in a marked patrol car with Maxey riding in the passenger seat and Hohman driving.

Before heading out on patrol, Corporal Maxey reviewed the above Bulletin. Maxey also spoke directly with Detective Handy, who was investigating the robbery, and Handy shared additional information with Maxey and showed him additional photos not depicted in the Bulletin.

While Maxey and his partner were out on patrol, at approximately 11:00 p.m., they observed a black Chrysler 300 being driven about a mile and a half away from where the robbery had been committed the prior night. Maxey observed that the vehicle matched the description of the suspect vehicle in the Bulletin and the photos, including having chrome or silver wheels.

The patrol car passed the Chrysler 300, then turned around so that it was behind the vehicle. Maxey ran the vehicle's license plate in the electronic Law Enforcement Information Network ("LEIN") and the system returned a message indicating that the vehicle was uninsured. Maxey testified that the system is updated as to insurance information for vehicles on a monthly basis. Maxey decided to pull the vehicle over, to conduct a traffic stop to determine if the vehicle was insured. Maxey testified that if the driver could provide proof of insurance, he would end the traffic stop.

Maxey advised his partner to pull the vehicle over and the patrol car's lights and sirens were activated. Hopkins then pulled the vehicle over, in a parking lot of a stip mall.

Maxey approached the passenger door, while his partner approached the driver, later identified as Hopkins.

After being pulled over, Hopkins acknowledged that the vehicle was not insured and also

advised that his driver's license was suspended. Driving without insurance, and driving on a suspended license, are both misdemeanor criminal offenses in Michigan.

Meanwhile, Maxey was at the passenger side of the vehicle, and the tinted windows were rolled down. That enabled Maxey to observe Hopkins, the driver of the vehicle. Maxey saw that Hopkins matched the description of the robbery suspect – including having visible tattoos on Hopkins's exposed forearms.

Maxey decided to arrest Hopkins and he was placed in the back of the patrol car, to be transported to the Pittsfield Township Police Department. Maxey advised his supervisor that he was arresting a person who matched the description of the robbery suspect, and that information was relayed to Detective Handy.

Because Hopkins was being arrested after the traffic stop, the Pittsfield Police Department Procedure required that his vehicle be impounded and authorized an inventory search to be conducted. (Govt.'s Ex. 8).

While en route to the police station in Maxey's patrol car, Hopkins began speaking with the officers and told them he had previously been arrested and served prison time. Hopkins also began asking the officers questions. Although Maxey and his partner were not asking Hopkins any questions, Maxey chose to advise Hopkins of his *Miranda* rights. Reading from a card that he carries with him, Maxey read aloud the *Miranda* rights to Hopkins, speaking in a normal (not rushed) cadence:

> So obviously you've been arrested before, you said you've been out for seven years. Yeah. Alright, so before you answer any questions or make any statements, you must fully understand your rights. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have one present if you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before

any questioning if you wish. You can decide at any time to exercise your rights and not answer any questions or make any statements.

(Govt.'s Ex. 3). Hopkins verbally responded that he understood those rights read to him.

Maxey testified that Hopkins was alert and engaged while in his presence and gave him no reason to believe that he was impaired in any manner.

Hopkins was placed in a room at the police station. At one point, Hopkins briefly laid down on the floor and Maxey came in and asked him if he was alright and asked if he wanted to lean on a chair to rest. Hopkins responded, "No, I'm good. I'm good. I just been up since six."

Detective Handy arrived at the police station within about an hour of the traffic stop. Handy entered the room where Hopkins was waiting and introduced herself. Hopkins said "Oh, you a detective? So this ain't good."

Before Detective Handy asked Hopkins any questions, he was again apprised of his *Miranda* rights and confirmed that he understood them. Detective Handy handed Hopkins a blank "Pittsfield Township Police Department Miranda Rights Form" that enumerated his rights by stating in pertinent part:

YOUR RIGHTS

Before you are asked questions, you must be informed of your rights:

1. You have the right to remain silent.
2. Anything you say can and will be used against you in court.
3. You have the right to talk with a lawyer, and have him/her present with you while you are being questioned.
4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.
5. You can decide at any time to exercise these rights and not answer any questions or make any statements.

If you understand each of these rights, place your initials next to each item.

(Govt.'s Ex. 5). At the bottom of that blank form, it had a "WAIVER" section that includes a signature line after the following paragraph:

> I have read or have been given the opportunity to read my rights as listed above and they have been read to me. I understand what my rights are. I am willing to answer questions and make a statement. I have not been threatened, forced or promised anything in any way to cause me to believe that I have to make a statement or answer questions.

(*Id.*). While handing Hopkins that form, Detective Handy stated:

> Okay, well, first thing I'm gonna do: you have constitutional rights. I follow everyone's constitutional rights. Okay? So just remember that as I read this, that we can go through a process and you can decide at some point to stop. Okay? So you can talk to me if you want a little bit, but you don't have to all the way. So can you read each of those and initial them . . .

(Govt.'s Ex. 4).

Hopkins verbally responded that he knew his rights, saying "Right to remain silent. I know all of them." (*Id.*). Nevertheless, Detective Handy proceeded further, to ensure Hopkins understood his rights, and asked Hopkins to read them all aloud. Hopkins did so, and also initialed next to each of the five enumerated rights, and signed the WAIVER section of the form. Thus, Hopkins signed a written waiver of his *Miranda* rights.

Detective Handy credibly testified that Hopkins was alert and engaged at all times while speaking with her, although both she and Hopkins both yawned at one point. Hopkins did not appear to be excessively tired or incapable of understanding his rights. If Hopkins had advised that he was tired, Detective Handy would have rescheduled the interview.

At no point did Hopkins say or do anything that made Detective Handy question whether Hopkins was impaired or incapable of understanding his rights. Hopkins did not do or say

anything that would make her question his educational level or cognitive abilities. [1]

Detective Handy spoke to Hopkins in a cordial and professional tone during the interview. No threats were made to made to Hopkins. There was no coercive conduct by the police officers. Hopkins chose to speak with Handy for a period of time. During the interview, Detective Handy asked Hopkins questions about some of the robberies.

Later, that same night, a police officer employed by the City of Ypsilanti (Officer Gorman) came to the police station and wished to speak with Hopkins. (Govt.'s Ex. 6). Officer Gorman read Hopkins his *Miranda* rights. After he did so, Hopkins exercised those rights, stating he did not wish to speak with him, and Officer Gorman left.

After speaking with Hopkins, Detective Handy drafted and submitted several search warrant affidavits, in support of search warrants she wished to obtain in order to search Hopkins's vehicle (Govt. Ex. 7), his residence (Govt. Ex. 11), his cellphone and cellular provider (Govt. Exs. 9 & 10) and his email account. (Govt. Ex. 12).

After initially drafting the search warrant affidavits, Detective Handy sent them to an assistant county prosecutor for review, to see if the prosecutor believed them to be sufficient. The prosecutor had some suggested changes and edits to the search warrant affidavits, which Handy then made. Handy had a good faith belief that the search warrant affidavits were sufficient to establish the requisite probable cause.

After the search warrants and supporting affidavits were submitted to the Court, Detective Handy was contacted by the court and the court had her swear to the facts in the search

---

[1] There was no evidence presented at the hearing to support Hopkins's suggestion, in his brief, that he may have a learning disability. (*See* Pl.'s Br. at 3).

warrant affidavits. The magistrate judge eventually signed all of the requested search warrants, but addressed them individually, and did not sign them all at once.

## ANALYSIS & CONCLUSIONS OF LAW

**I.    The Stop Of Hopkins's Vehicle Was Lawful.**

The Fourth Amendment guarantees the right "to be secure ... against unreasonable searches and seizures." U.S. Const. amend. IV. "Consistent with the Fourth Amendment, '[a] police officer may stop a motorist when he possesses probable cause of a civil infraction or has reasonable suspicion of criminal activity." *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016) (citing *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012)). "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008). The prohibition of unlawful stops is primarily enforced "through the exclusionary rule, which requires the suppression of any evidence seized during a vehicle search premised on an illegal traffic stop." *Lyons*, 687 F.3d at 763.

As the Sixth Circuit has explained, a "pretextual stop occurs when the police use a legal justification to make a stop . . . in order to search a person or his vehicle, or interrogate him, for an unrelated and more serious crime for which they do not have the reasonable suspicion necessary to support a stop." *United States v. Huguenin*, 154 F.3d 547, 559 n.10 (6th Cir. 1998) (alterations in original) (quotation omitted). Police officers may make pretextual stops "for any infraction, no matter how slight . . . " *Blair*, 524 F.3d at 748 (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)).

Here, Corporal Maxey observed a vehicle matching the description of the vehicle that

had been involved in an armed robbery, and observed it less than 24 hours after the robbery, and at a location only a mile and a half away from the location of that robbery. Maxey then ran the vehicle's license plate in LEIN and the system returned a message indicating that the vehicle was uninsured. Driving a vehicle a vehicle without insurance is a misdemeanor in Michigan. Thus, Maxey and his partner had probable cause to stop Hopkins's vehicle based upon that information from the LEIN. *United States v. Conley*, 2023 WL 165966 at *4 (6th Cir. 2023). This information alone supplied the officers with probable cause to stop Hopkins's vehicle and require him to produce proof of insurance, which he was unable to provide. *Id.*

At the hearing, Defendant argued for the first time that the insurance information from the LEIN should be deemed insufficient to establish probable for a traffic stop cause because the information could possibly be inaccurate. (*See* 1/8/25 Hrg. Tr.). The Court rejects Defendant's argument. Police officers are entitled to rely upon information in LEIN to conduct a traffic stop. *United States v. Conley, supra* (officers could rely on LEIN information showing lack of insurance)*; see also United States v. Lawrence*, 425 F. Supp. 3d 828, 833 (E.D. Mich. 2019) (collecting cases); *Coates v. City of Detroit*, 2024 WL 1606064 at *3 (E.D. Mich. 2024) (collecting cases). The traffic stop was lawful.

### II. Hopkins's Knowingly And Voluntarily Waived His *Miranda* Rights Before Speaking With Detective Handy.

In his motion, Defendant Hopkins seeks to suppress statements he made while being interviewed by Detective Handy.

"Under *Miranda v. Arizona*, 'the prosecution may not use statements ... stemming from custodial interrogation of the defendant unless' law enforcement officials advised the defendant of his 'right to remain silent, that anything he says can be used against him in a court of law, that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *United States v. Williams*, 998 F.3d 716, 736 (6th Cir. 2021) (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

Hopkins was "in custody" for purposes of *Miranda*, once he was placed in the patrol car by Corporal Maxey and his partner. It is also undisputed that Hopkins was in custody while at the police station.

"Once *Miranda rights* are read, a suspect may either waive their rights or invoke them." *Id.* A suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, "waives the right to remain silent by making an uncoerced statement to the police." *Id.* Thus, a waiver "can be implicit, but an invocation must be explicit." *Id.* (citations omitted). "Even so," as explained by the Sixth Circuit in *United States v. Williams*, "a waiver must be made 'voluntarily, knowingly and intelligently:'"

> This is so if the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). To guide this analysis, "[we] look[ ] at the totality of the circumstances concerning 'whether a defendant's will was overborne in a particular case.' " *Ledbetter v. Edwards,* 35 F.3d 1062, 1067 (6th Cir. 1994) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Law enforcement may not coerce a suspect into waiving his *Miranda* rights. We will accordingly invalidate a *Miranda* waiver if: "(I) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements." *United States v. Binford*, 818 F.3d

261, 271 (6th Cir. 2016) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

*Id.*

Here, the evidence establishes that Hopkins was properly advised of his *Miranda* rights, by both Corporal Maxey, and again by Detective Handy, and that Hopkins knowingly and voluntarily waived them. The Court finds no evidence of police coercion or any undue influence. The evidence establishes that Hopkins knowingly and voluntarily waived his *Miranda* rights before any questioning by Detective Handy.

**III.     The Challenged Search Warrants Were Supported By Probable Cause And, Even If They Had Not Been, The *Leon* Good-Faith Exception Would Apply Here.**

The federal constitution applies to warrants issued in state courts, such as the ones at issue here. *United States v. Helton*, 35 F.4th 511, 517 (6th Cir. 2022). Under the Fourth Amendment, a judge may issue a search warrant only "upon probable cause." U.S. CONST. amend. IV.

Probable cause is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). To issue a warrant, a magistrate judge need only decide there is a "fair probability" that, given "all the circumstances set forth in the affidavit," the search will yield evidence of criminal activity. *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (quoting *Illinois v. Gates*, 462 U.S. 213, 218 (1983)). This Court's review is limited to ensuring that the magistrate judge had a "substantial basis" for deciding probable cause existed. *Id.*

Probable cause exists when an affidavit shows a "fair probability" that the police will find evidence in the place they seek to search. The Court considers whether probable cause for the warrants to issue based upon the "four corners" of the search warrant affidavit. *United States*

*v. Burrell*, 114 F.4th 537, 550 (6th Cir. 2024). The conclusions drawn from the affidavit by the court that issued the warrants are afforded "significant deference," such that the issuing court's "discretion [will] only be reversed if it was arbitrarily exercised." *United States v. Crawford*, 943 F.3d 297, 305 (6th Cir. 2019).

Having reviewed each of the challenged search warrant affidavits signed by Detective Handy, this Court concludes that the low bar of probable cause has been met.

For example, as to the search warrant affidavit in support of the search warrant for Hopkins's vehicle, it established a sufficient nexus between Hopkins, the robberies, and Hopkins's vehicle. Detective Handy's affidavit outlined information pertaining to several of the robberies, including the fact that Hopkins' tattoos appeared to match surveillance video and depictions of a matching vehicle used by the suspect at some of the robberies. And by referencing various items that would have been inside the robbery suspect's vehicle, her search warrant sought several items of clothing, items taken from the robbery victims, and a specific brand of cigarettes (Maverick) that were purchased by the suspect prior to one of the robberies.

As the Government notes, where a search warrant establishes where a defendant resides and his active engagement in certain types of criminal activity, an inference can reasonably be made that the "criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence." *United States v. Sanders*, 106 F.4th 455, 462 (6th Cir. 2024). Here, Detective Handy's affidavit that was submitted in support of the search warrant for his residence outlined the facts connecting Hopkins to the series of robberies, including Hopkins's physical description, including his tattoos, and his Chrysler vehicle that matched the vehicle driven by the robbery suspect.

Moreover, even if any of the affidavits failed to establish probable cause, the Court concludes that the *Leon* good-faith exception to suppression of the evidence would clearly apply under the facts and circumstances presented here.

As explained by the Sixth Circuit in *Burrell:*

> In *United States v. Leon*, 468 U.S. 897, 905, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court held that evidence "seized in reasonable, good-faith reliance on a search warrant" will not be suppressed, even when that warrant "is subsequently held to be defective." The good-faith exception requires us to "ask 'whether a reasonably well[-]trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (quoting *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008)). If the answer to that question is "yes," then suppression is appropriate. *Id.*

*Burrell,* 114 F.4th at 553.  "There are four circumstances in which an officer's reliance on the search warrant would have been unreasonable. See *Leon*, 468 U.S. at 923, 104 S.Ct. 3405." *Id*. Those circumstances under which an officer's reliance on the issued warrants cannot be reasonable and where suppression therefore remains appropriate are:  1) when the affidavit supporting the search warrant contains a knowing or reckless falsity; 2) when the magistrate who issued the search warrant wholly abandoned his or her judicial role; 3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; or 4) when the warrant is so facially deficient that it cannot reasonably be presumed valid.  *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005).

The third circumstance above involves what "has come to be known as a 'bare bones' affidavit."  *Burrell, supra,* at 553-54.  "Bare-bones affidavits 'nakedly assume or vaguely conclude, without attempting to demonstrate why, probable cause has been satisfied.' *Sanders*, 106 F.4th at 468. Such an affidavit 'states only 'suspicions, beliefs, or conclusions, without

16

providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.' "*White*, 874 F.3d at 496 (quoting *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005))." *Id.* This third circumstances is typically the one that Defendants argue applies to their situation.

Here, Hopkins argues that the good-faith exception does not apply, but he did not articulate in his brief (or during oral argument) which circumstance he believes applies. (*See* Def.'s Br. at 14; 1/8/25 Hrg. Tr.).

Nevertheless, the Court concludes that none of them apply here. There is no evidence that any of the search warrant affidavits contain any knowing or reckless falsities. There is also no evidence that the magistrate who issued the search warrants wholly abandoned the judicial role. To the contrary, the evidence reflects that the magistrate carefully considered the search warrant requests and the supporting affidavits. Finally, the Court concludes that the search warrant affidavits at issue here are not "bare bones" or otherwise so lacking in indicia of probable cause as to render official belief in them entirely unreasonable.

As such, even if any of the search warrants failed to establish probable cause, this Court concludes that *Leon* good-faith exception to suppression of the evidence would clearly apply under the facts and circumstances presented here.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant Hopkins's Motions to Suppress (ECF Nos. 41 and 42) are DENIED.

IT IS SO ORDERED.

Dated:  January 16, 2025         s/Sean F. Cox
                                             Sean F. Cox
                                             United States District Court Judge

I hereby certify that on January 16, 2025, the document above was served on counsel and/or the parties of record via electronic means and/or First Class Mail.

                                                                 s/Emily Vradenburg
                                                                 Case Manager